UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **09-cv-00447-JLK**

**DISH NETWORK CORPORATION, and**
**DISH NETWORK LLC,**

       Plaintiffs,

v.

**ARCH SPECIALTY INSURANCE COMPANY,**
**ARROWOOD INDEMNITY COMPANY,**
**TRAVELERS INDEMNITY COMPANY OF ILLINOIS,**
**XL INSURANCE AMERICA, INC., and**
**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,**

       Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Kane, J.

       Plaintiffs, DISH Network Corporation and DISH Network LLC (formerly known as

EchoStar Communications Corporation and EchoStar Satellite LLC; collectively "DISH") have

filed suit against Arch Speciality Insurance Company ("Arch"), Arrowood Indemnity Company

("Arrowood"), Travelers Indemnity Company ("Travelers"), XL Insurance America ("XL"), and

National Union Fire Insurance Company ("National Union") (collectively "Defendant Insurers")

seeking a declaratory judgment that Defendant Insurers are obligated to defend DISH in a patent

infringement action pending against them in the Central District of California ("Katz lawsuit").[1] DISH also seeks a declaratory judgment that Defendant Insurers are obligated to indemnify DISH for any settlement or judgment paid in connection with the Katz lawsuit.[2] Defendant Insurers contest whether EchoStar Satellite LLC is covered under the policies sold to Plaintiffs, and in any event, whether the policies cover the Katz lawsuit at all. Specifically, the parties dispute whether the insurance contract provisions allowing coverage for "advertising injury" implicate Defendant Insurers' duties to defend and indemnify.

The parties agreed to simplify the case by proceeding in multiple phases, first addressing whether the Katz lawsuit triggered the Defendant Insurers' duty to defend DISH. *See Scheduling Order*, Doc. 51 at 22. Defendant Insurers have filed summary judgment motions arguing that they are under no duty to defend DISH in the Katz lawsuit. I have considered the parties' arguments in support of and in opposition to these motions. Defendant Insurers have no duty to defend DISH against the patent infringement claims contained in the Katz lawsuit and are, as a result, entitled to summary judgment. In the absence of a duty to defend, Defendant Insurers have no duty to indemnify DISH and cannot have breached any contractual duties. Defendant Insurers' Motions for Summary Judgment, Docs. 62, 65, 66, 68, and 72 are GRANTED.

---

[1] The Katz lawsuit was originally filed in the Northern District of California. C:07-03151 WDB (N.D. Cal.). It has, however, been transferred to the Central District of California where it was consolidated with several related cases filed by the same plaintiff. CV-07-6222-RGK (FFMX). The lawsuit will remain in the Central District of California as part of the multi-district litigation for discovery and pre-trial practice.

[2] DISH also claims that, in refusing to defend against the Katz lawsuit, Defendant Insurers are in breach of contract, breached the covenant of good faith and fair dealing, and acted in bad faith.

## JURISDICTION AND VENUE

Plaintiffs and Defendants are citizens of different states for purposes of establishing diversity jurisdiction.[3] 28 U.S.C. § 1332(c)(1). Additionally, the amount in controversy in this case exceeds the $75,000 statutory threshold. 28 U.S.C. § 1332(a). Accordingly, jurisdiction in the United States District Court is proper. Further, because a significant part of the events or omissions giving rise to the claim for insurance coverage occurred in the District of Colorado and the Defendants "reside" in this judicial district for venue purposes, venue in the District of Colorado is proper. 28 U.S.C. § 1391(a)(2).

## FACTS

On June 14, 2007, Ronald A. Katz Technology Licensing, L.P. ("Katz") sued EchoStar Satellite Communications, LLC for patent infringement. The Katz plaintiff filed a "Complaint for Patent Infringement and Demand for Jury Trial" and identified one count of "Patent Infringement" as the sole cause of action. In its amended complaint filed August 28, 2008, Katz alleges EchoStar "directly and contributorily infringed, and induced others to infringe, one or more claims of each of the patents [in suit] by making, using, offering to sell, and/or selling within the United States automated telephone systems, including without limitation the DISH

---

[3] Plaintiff DISH Network Corporation is incorporated in the state of Nevada, with its principal place of business in Colorado. Plaintiff DISH Network LLC is a Colorado registered LLC, wholly-owned by DISH Network Corporation. Defendant Arch Specialty Insurance Company is incorporated in the state of Nebraska, with its principal place of business in New York. Defendant Arrowood Indemnity Company is incorporated in the state of Delaware, with its principal place of business in North Carolina. Defendant Travelers Indemnity Company of Illinois is incorporated in the state of Connecticut, with its principal place of business in Connecticut. Defendant XL Insurance America, Inc. is incorporated in the state of Delaware, with its principal place of business in Connecticut. Defendant National Union Fire Insurance Company of Pittsburgh is incorporated in the Commonwealth of Pennsylvania, with its principal place of business in New York.

Network customer service telephone system, that allow their customers to perform pay-per-view ordering and customer service functions over the telephone."[4]

According to the Katz amended complaint, Katz acquired from Ronald A. Katz the rights to his entire "interactive call processing" patent portfolio in 1994, and twenty-three of these patents are identified as infringing patents-in-suit. Katz describes the patents-in-suit as having multiple fields of use, including but not limited to financial services call processing, automated securities transactions, automated credit card authorization services, automated wireless telecommunication services and support, automated health care services, and product and service support. DISH asserts claims in some of the patents in suit are relevant to the Defendant Insurers' duty to defend DISH. For example, Claim 219 of patent-in-suit # 5828734 states that the patent claims "[a] telephone interface system . . . wherein said selective operating format involves advertising a product for sale."

Upon being served with the Katz complaint, DISH tendered the matter to Defendant Insurers. From August 1, 2001, through August 1, 2004, Defendant Insurers issued commercial general liability coverage forms ("CGL's") to EchoStar Communications Corporation, DISH's predecessor, that provided coverage against "advertising injury" claims, subject to certain exceptions and exclusions. The Arrowood and Travelers policies provided primary coverage while the Arch, National Union, and XL policies provided protection for excess liability, which type of coverage is available only if the insured's primary coverage has been exhausted.

---

[4] The language in the Katz Complaint mirrors the language of the federal patent statute, which defines patent infringement as "mak[ing], us[ing], offer[ing] to sell, or sell[ing] any patented invention . . .." 35 U.S.C. § 271.

# LEGAL STANDARDS AND ANALYSIS

## A. Summary Judgment

Summary judgment is appropriate only if there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2); *Adamson v. Multi. Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under governing law; a dispute of fact is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.*

As the moving parties, Defendant Insurers bear the burden of demonstrating that no genuine issue of material fact exists. *Id.* at 1145. Because they do not bear the ultimate burden of persuasion at trial, however, they may satisfy this burden by demonstrating a lack of evidence for an essential element of DISH's claim. *Id.* I do not weigh the evidence in deciding whether Defendant Insurers have carried their burden. Instead I draw all reasonable inferences from it in the light most favorable to DISH. *Id.* Neither unsupported conclusory allegations nor mere scintilla of evidence, however, are sufficient to create a genuine dispute of material fact on summary judgment. *See Mackenzie v. City & County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005). If Defendant Insurers carry their burden under Rule 56(c), DISH must demonstrate more than "some metaphysical doubt" as to the material facts to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## B. Choice of Law

Because I exercise jurisdiction pursuant to the diversity statute, the substantive law of Colorado controls. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *Blackhawk-Central City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co.*, 214 F.3d 1183, 1188 (10th Cir. 2000) (citing *Blanke v. Alexander*, 152 F.3d 1224, 1228 (10th Cir. 1998)). Therefore, Colorado choice-of-law

rules apply.

In contract actions, Colorado applies the "most significant relationship" test articulated in Chapter 8 of the Restatement (Second) of Conflict of Laws (1971). *See ITT Specialty Risk Servs. v. Avis Rent a Car Sys.*, 985 P.2d 43, 47 (1998) (citing *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 601 P.2d 1369 (1979)). Because there is no choice of law provision in the contested insurance policies, I apply the law of the state with the most significant relationship to the transaction at issue and the parties. Restatement (Second) of Conflict of Laws § 188 (1971). In making this determination, I consider: (a) the place of contracting, (b) the place the contract was negotiated, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Id.*

In the instant case, each of the contested policies was negotiated and delivered in Colorado. *See* National Union Policy, Doc. 62-3 at 2; Arrowood Policy, Doc. 65-3 at 4; Traveler's Policy, Doc. 66-1 at 1; XL Policy, Doc. 68-1 at 1; and Arch Policy, Doc. 72-1 at 2. Although the underlying action has been filed in California, the bulk of performance was in Colorado; DISH paid their premiums and maintain their principal place of business in Colorado. Furthermore, the parties are residents of or incorporated in multiple states; there is no one jurisdiction with an overriding interest in this litigation. Colorado is the state with the most significant relationship to the transactions at issue and the parties, and I apply Colorado law to this dispute.

## C. Determining the Duty to Defend[5]

As discussed above, Defendant Insurers must demonstrate a lack of evidence for an essential element of DISH's claim to prevail on summary judgment. DISH, for its part, "need only show that the underlying claim may fall within policy coverage" to establish a duty to defend under Colorado law. *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 614 (Colo. 1999) (quoting *Standun, Inc. v. Fireman's Fund Ins. Co.*, 73 Cal. Rptr. 2d 116, 120 (Cal. Ct. App. 1998)). If the alleged facts even "potentially" or "arguably" trigger coverage under the policy and there is no applicable exclusion, the insurer is bound to provide a defense. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003). Accordingly, to prevail at summary judgment Defendant Insurers must prove either that there exist no allegations in the underlying complaint which would impose a liability covered by the policy or that the underlying claim falls within an exclusion articulated in the contested policy. *See Compass*, 984 P.2d at 613-14. Therefore, to determine whether there is a duty to defend, I examine and interpret the language of the contested insurance policies and decide whether the complaint alleges any conduct that could possibly, however doubtfully, trigger coverage.

---

[5] An insurer's duty to defend is often erroneously conflated with an insurer's duty to indemnify. The duty to defend concerns an "insurance company's duty to affirmatively defend its insured against pending claims." *Constitution Assocs. v. N.H. Ins. Co.*, 930 P.2d 556, 563 (Colo. 1996). In contrast, the duty to indemnify relates to the insurer's "duty to satisfy a judgment entered against the insured," and its existence depends upon the ultimate determination of coverage in the underlying action as decided by the trier of fact. *Constitution Assocs..,* 930 P.2d at 563; *Hecla Mining Co. v. N. H. Ins. Co.,* 811 P.2d 1083, 1089 (Colo. 1991). Whereas the latter may rely on facts outside of the complaint to establish an insurer's obligation to indemnify, the former must limit its examination to the four corners of the underlying complaint. *Gen. Sec. Indem. Co. v. Mountain States Mut. Cas. Co.*, 205 P.3d 529, 532 (Colo. Ct. App. 2009). Accordingly, the determination of the insurer's duty to defend is separate and distinct from the determination of the duty to indemnify. *Cotter Corp. v. Am. Empire Surplus Lines Inis. Co.,* 90 P.3d 814, 827 (Colo. 2004).

Under Colorado law, insurance polices are contracts and must be interpreted according to the general principles of contract analysis.[6]  *Cyprus Amax Minerals Co.*, 74 P.3d at 299 (citing *Compass Ins. Co.*, 984 P.2d at 613).  Therefore my review is limited to the four corners of the contested insurance polices, unless the policy terms are ambiguous or used in a special or technical sense not defined in the policy.  *See KN Energy, Inc. v. Great Western Sugar Co.*, 698 P.2d 769, 776 (Colo. 1985) (citing *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984)).

Terms are ambiguous when they are reasonably susceptible to more than one meaning; the parties' disagreement about a term's meaning is insufficient to establish ambiguity.  *See TerraMatrix, Inc. v. U.S. Fire Ins. Co.*, 939 P.2d 483, 486 (Colo. Ct. App. 1997).  Because of the unique nature of insurance contracts and the relationship between the insurer and insured, I construe ambiguous provisions against the insurer and in favor of providing coverage to the insured.  *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990).  In determining whether an ambiguity exists, I may conditionally admit extrinsic evidence bearing upon the written terms' meaning, such as the parties' course of dealing and evidence of local usage.[7]  *KN Energy*, 698 P.2d at 777 (citing *Pepcol Mfg.*, 687 P.2d at 1314 n. 3); *see also Allstate Ins. Co. v. Juniel*, 931 P.2d 511, 516 (Colo. App. 1996).  I may not, however, consider "the parties' own extrinsic expressions of intent."  *Id*.  Furthermore, the terms of an insurance policy "are to be interpreted as understood by an ordinary person, not by one engaged in the insurance business."

_____

[6]  For instance, I read the provisions of the policies as a whole, rather than reading them in isolation.  *Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236, 239 (Colo. 1992).  I also strive to give effect to every provision, and to avoid reading the policies so as to render some provisions superfluous or contradictory.  *Gen. Sec. Indem. Co.*, 205 P.3d at 537.

[7]  This is consistent with the Parol Evidence Rule, which limits the admissibility of extrinsic evidence to the extent it seeks to vary, contradict, or add to a final written contract.

*Allstate Ins. Co.*, 931 P.2d at 516.

In support of its argument, DISH offers documentation from the Insurance Services Office ("ISO")[8] that traces the historic development of the contested policy language. DISH urges that this documentation is admissible extrinsic evidence because it is offered in support of their contention that "the operative policy language is susceptible to being interpreted in favor of coverage for patent infringement claims" – not as evidence of the parties' intent. Although I may properly consider extrinsic evidence in determining whether an ambiguity exists, I am generally limited to considering extrinsic evidence relating to the parties' prior course of dealing, peculiar local usage, or circumstances surrounding the making of the contract. The proffered documentation does not serve any of these purposes. Furthermore, the ISO drafting history delves deeply into the meaning of policy language as understood by insurance industry professionals. I must interpret the policies as they would be understood by an ordinary person – not as they would be understood by an insurance industry professional. *See Allstate Ins. Co.*, 931 P.2d at 516 (finding the trial court properly excluded extrinsic evidence consisting of depositions, insurer's internal memoranda, and communications with insurance officials). Accordingly, I do not consider the ISO drafting history in determining whether there exists any ambiguity in the contested policies.[9] [10] Having determined the scope of my inquiry, I now focus

---

[8] The ISO is an organization sponsored by the insurance industry that develops standard insurance policy language. Most insurance companies use ISO forms at least as a starting point for their commercial general liability policies. Four of the five Defendant Insurers availed themselves of these resources in drafting the policies at issue in this case; The National Union policy issued to Plaintiffs does not contain any ISO materials.

[9] DISH's argument that other courts routinely rely upon ISO drafting history in interpreting insurance policy language is similarly unavailing. In *Weitz Co. LLC v. MidCentury Ins. Co.*, the Colorado Court of Appeals rested its finding on its interpretation of the plain meaning and dictionary definitions of the contested terms, referring to the drafting history merely by way of further bolstering dicta. 181 P.3d 309 (Colo. Ct. App. 2007). The other cases

on whether Defendant Insurers have demonstrated a lack of evidence for an essential element of DISH's claim.

DISH argues the allegations in the Katz complaint give rise to coverage under the "advertising injury" portion of the CGL's issued by Defendant insurers. Under four of the five CGL policies at issue, DISH is entitled to coverage for an "advertising injury" only if the "advertising injury" is caused by an "occurrence."[11] [12] An "occurrence" is defined as "an offense committed in the course of advertising your goods, products and services that results in 'advertising injury.'" An "advertising injury" is defined as:

> (a) Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

cited by DISH in support of this proposition are similarly distinguishable. *See State Auto Prop. & Cas. Ins. Co. v. Travelers Indem Co. of Am.*, 343 F.3d 249, 255 n.9 (4th Cir. 2003) (Only citing ISO drafting history to note that the policy language at issue was the same as ISO's 1986 form which had been interpreted by several courts); *Adolfo House Dist. Corp. v. Travelers Prop. & Cas. Ins. Co.*, 165 F. Supp. 2d 1332, 1340 n.4 (S.D. Fla. 2001) (Reaching a decision without relying upon ISO drafting history and merely citing the drafting history in a footnote); *Bay Elec. Supply, Inc. v. Travelers Lloyds Ins. Co.*, 61 F. Supp. 2d 611, 617 (S.D. Tex. 1999) (Citing history as further support after reaching decision); *Montrose Chem. Corp. of Cal. v. Admiral Ins. Co.*, 913 P.2d 878, 891 (Cal. 1995) (Relying on California case law); *Super Duper Inc. v. Penn. Nat'l Mut. Cas. Ins. Co.*, 683 S.E. 2d 792, 794-95 n.1, 3-4 (S.C. 2009) (Only citing ISO drafting history to note that the policy language at issue followed ISO's 1998 standard language).

[10] Even if I were to consider the ISO language, the evidence appears of questionable utility to DISH. Contrary to DISH's argument, the drafting history seems to reveal a clear intent on the part of the ISO (a non-party to this suit) to preclude any coverage for injury resulting from patent infringement under the standard "advertising injury" provisions in commercial general liability policies.

[11] Defendant Arch's policy contains provisions that I read as having identical import despite different wording.

[12] The National Union policy includes slightly different language, allowing for coverage only where the complained of injury "arises solely out of" advertising. This difference is of no relevance to the following discussion.

(b) Oral or written publication of material that violates a person's right of privacy;
(c) Misappropriation of advertising ideas or style of doing business; or
(d) Infringement of copyright, title, or slogan.

Accordingly, DISH must prove three elements to establish a duty to defend for "advertising injury":  (1) it was engaged in "advertising" during the policy period when the alleged "advertising injury" occurred; (2) [Katz's] allegations created a potential for liability under one of the covered offenses (i.e., misappropriation of advertising ideas); and (3) a causal connection existed between the alleged injury and the advertising.[13]  If Defendant Insurers can demonstrate a lack of evidence for any one of these three elements, then they are under no duty to defend DISH for the alleged "advertising injury."  I consider each element in turn.

*1.  The Challenged Conduct Must be "Advertising"*

Of course, when a policy defines an "advertising injury" with reference to the enterprise that is "advertising," the definition of the former will ultimately and necessarily be informed by the definition of the latter.  Yet, the insurance policy definitions commonly lack a definition for the broader category of "advertising" itself, this omission betraying a tautological hole.

When interpreting an undefined term, I apply general contract principles and accord the term in question its plain and ordinary meaning.  *See Kane v. Royal Ins. Co. of Am.*, 768 P.2d 678, 680 (Colo. 1989).  To this end, dictionaries may be consulted.  *Hecla Mining Co.*, 811 P.2d at 1091.  Although Colorado courts have not discussed the plain and ordinary meaning of "advertising," courts in other jurisdictions have, often availing themselves of a dictionary's assistance for the purpose.  The generally accepted definition of advertising is the dissemination

---

[13]  In *Novell, Inc. v. Fed. Ins. Co.*, the 10th Circuit, applying Utah law, used a two-part test in determining whether the underlying complaint triggered the duty to defend under the "advertising injury" provision of a CGL policy.  141 F.3d 983, 986 (10th Cir. 1998).  This test mirrors elements two and three noted above.

of information to promote a product. *See Hameid v. Nat'l Fire Ins. of Hartford*, 1 Cal. Rptr. 3d 401, 403 (2003) (using Black's Law Dictionary and Random House Webster's Dictionary to define "advertising"); *Solers, Inc. v. Hartford Cas. Ins. Co.*, 146 F. Supp. 2d 785, 786 (E.D. Va. 2001) (using The American Heritage Dictionary and Merriam-Webster's Collegiate Dictionary); *Smartfoods, Inc. v. Northbrook Prop. & Cas. Co.*, 618 N.E.2d 1365, 1366 (Mass. App. Ct. 1993) (using Webster's Third New Intl. Dictionary).

Importantly, however, dictionary entries are relied upon only as starting points and are not held to encompass fully the definition of "advertising" for purposes of "advertising injury" liability coverage. Instead, dictionary entries provide a base definition from which courts elaborate with some care the distinction between advertising and solicitation. Although the popular conception of advertising often includes solicitation and vice versa, most jurisdictions expressly hold that the two are separate endeavors. Specifically, an activity designed to facilitate sales that is directed towards the public at large is "advertising" and within the world of possible coverage; an activity designed to facilitate sales that is peddled to a single individual is "solicitation" and categorically precluded from coverage. Thus, the "advertising injury" inquiry evaluates the two terms by reference to whom the marketing is being promoted.[14] *See Monumental Life Ins. Co. v. U.S. Fid. & Guar. Co.*, 617 A.2d 1163, 1173 (Md. Ct. Spec. App. 1993) (one-on-one solicitation by plaintiff's agents was not advertising; "[t]he plain meaning of the term 'advertising' to a reasonably prudent person is not susceptible of more than one meaning, and encompasses only the 'public' sense of the word"); *Peerless Lighting Corp. v. Am. Motorists Ins. Co.*, 98 Cal. Rptr. 2d 753, 763 (Cal. Ct. App. 2000) (stating that "advertising" as

---

[14] Courts do not always distinguish between "advertising" and "solicitation." *See infra* n. 16.

used in an insurance policy does not include effort to sell a product specifically manufactured for a single customer for a specific project through a competitive bidding process); *First Bank & Trust Co. v. N. H. Ins. Grp.*, 124 N.H. 417, 417 (1983) (affirming judgment that "the mere explanation of bank services to a couple in a private office cannot be considered 'advertising'"); *Smartfoods, Inc.,* 35 Mass. App. Ct. at 243 (1993) ("[A]dvertising means a public announcement to proclaim the qualities of a product . . .. Wide dissemination of information is typically the objective of advertising").  Because solicitation is excluded from the scope of "advertising," it is likewise excluded from liability coverage under an "advertising injury" provision.  Hence, the distinction between a public versus individual audience is crucial.[15]

The Katz complaint focuses on DISH's operation of allegedly infringing "automated telephone systems . . . that allow their customers to perform pay-per-view ordering and customer service functions over the telephone."  Amended Katz Complaint, Doc. 62-2, at 9.  The Katz complaint does not specifically describe these "customer service functions," and DISH fails to elaborate upon its usage of these telephone systems.  Even drawing all favorable inferences in favor of DISH and assuming DISH uses these telephone systems to solicit business, it is unclear whether these activities constitute "advertising."  A telephone conversation is, with very limited exception, a two-party interaction.  Any offers to sell are not "directed to the public at large": they are directed only to the caller on the other end of the line.  Other courts have, however,

_____

[15] This definition comports with the definition of "advertisement" found in the Arch CGL policy issued to DISH.  This policy defines "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products, or services for the purposes of attracting customers or supporters."  Doc. 72-1 at 17.  Of the five policies at issue, the Arch policy is the only one that contains a definition of either "advertising" or "advertisement."  Although the 1998 Policy issued by Arrowood also includes this definition of advertisement, for purposes of this summary judgment motion it is the 1996 Arrowood policy that is at issue.

found there to be "advertising" in somewhat analogous situations. For instance, in both *Hyundai Motor Am. v. Nat'l Union Fire Ins. Co.* and *Amazon.com Int'l Inc. v. Am. Dynasty Surplus Lines Ins. Co.*, the courts found individual interactions with customers through websites to be "advertising" for purposes of liability coverage under the term "advertising injury." 600 F.3d 1092, 1098 (9th Cir. 2010); 85 P.3d 974, 977 (2004). For purposes of this summary judgment motion, I resolve this issue in DISH's favor and find its activities constitute "advertising."

### 2. *There Must be Potential Liability Under one of the Covered Offenses*

Courts define "advertising injury" according to the standard principles of contract interpretation. *See generally Tynan's Nissan v. Am Hardware Mut. Ins. Co.*, 917 P.2d 321 (Colo. Ct. App. 1995) (applying general principles of contract interpretation in giving meaning to the term "advertising injury"). As such, the definition for "advertising injury" given within the pertinent insurance policy controls, unless there is ambiguity in the policy language. *See USAA Prop. & Cas. Ins. Co. v. Anglum,* 119 P.3d 1058, 1059 (Colo. 2005).

As noted above, four of the five insurance policies issued by Defendant Insurers define an "advertising injury" as:

> (a) Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
> (b) Oral or written publication of material that violates a person's right of privacy;
> (c) Misappropriation of advertising ideas or style of doing business; or
> (d) Infringement of copyright, title, or slogan.

DISH asserts that offense (c), "misappropriation of advertising ideas or style of doing business," gives rise to Defendant Insurers' duty to defend in this case. Thus, an inquiry into the occurrence of an "advertising injury" necessitates understanding that phrase. DISH argues this phrase is ambiguous; the ambiguity must be construed against Defendant Insurers; and

Defendant Insurers are under a duty to defend.  I disagree.  "Misappropriation of advertising ideas or style of doing business is not ambiguous because it is defined by case law and common usage."  *Fluoroware, Inc. v. Chubb Group of Ins. Cos.*, 545 N.W.2d 678, 682-83 (Minn. Ct. App. 1996).  Accordingly, I turn to the case law and common usage to determine whether Insurer Defendants are obligated to defend DISH in the Katz lawsuit.

### a.  *"Misappropriation of Advertising Ideas or Style of Doing Business"*

Colorado law has not comprehensively addressed what constitutes either an "advertising idea" or a "style of doing business."  Case law is entirely silent on the make-up of an "advertising idea" and has provided only a partial definition in the negative regarding a "style of doing business."  The sole case speaking to the latter, *Tynan's Nissan*, holds that a generic style of doing business not related to advertising activities is not a "style of doing business" that will trigger liability coverage for an "advertising injury."  917 P.2d at 324-25.  Put another way, *Tynan's Nissan* simply reads a requirement of a causal connection between the "advertising" and the "injury" into the definition of "style of doing business" by requiring that the same actually involve advertising.  In the absence of Colorado law interpreting "misappropriation of advertising ideas or style of doing business," I may seek guidance from authorities in other jurisdictions.  *See People v. Disher*, 224 P.3d 254, 257-58 (Colo. 2010).

### i.  *Misappropriation of Advertising Ideas*

Most courts hold that "misappropriation of advertising ideas" means the "wrongful taking of the manner by which another advertises its goods or services" or the "wrongful taking of an idea about the solicitation of business."[16]  *Discover Fin. Servs. LLC v. Nat'l Union Fire*

---

[16]Here I note the possible confusion over courts' seemingly inconsistent application of the word "solicitation."  As discussed *supra* at 12-13, in the context of determining what is

*Ins.*, 527 F. Supp. 2d 806, 824 (N.D. Ill. 2007) (quoting *Amazon*, 85 P.3d at 977). The misappropriation of advertising ideas must occur "in the elements of the advertising itself, in its text, form, logo, or pictures, rather than in the product being advertised." *Iolab Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1506 (9th Cir. 1994).

Although some courts have found that patent infringement cannot constitute an advertising injury, I think this is an unnecessarily broad and incorrect statement.[17] Admittedly, the fact that a patented technology is "capable of advertising goods or carrying promotional messages does not transform the technology into an advertising idea." *Discover*, 527 F. Supp. 2d at 824. "[P]atent infringement may," however, " constitute an advertising injury 'where an entity uses an advertising technique that is itself patented.'" *Id.* at 977 (quoting *Iolab Corp.*, 15 F.3d at 1507 n.5). The crucial inquiry, therefore, focuses on whether the complained of advertisement incorporates a patented advertising technique as an element. If so, then the alleged infringement may constitute "advertising injury." If, however, the alleged infringement

---

"advertising" for purposes of liability coverage under the term "advertising injury," many courts hold that "advertising" is separate from and exclusive of "solicitation."

In contrast, when courts use "solicitation" in the context of defining an "advertising idea," they are not contemplating the audience towards which the "solicitation" is targeted, but are instead interested only in the sale-facilitating nature of "solicitation." Thus, "solicitation" here means simply "marketing method" or "marketing system," without concern for the audience towards which the "marketing method" or "marketing system" is pitched. *See Hyundai*, 600 F.3d at 1098 (finding complaint's use of the words "marketing method" and "marketing system" synonymous with "advertising idea).

[17] Defendant Insurers cite a variety of cases for the proposition that patent infringement can never constitute "advertising injury." *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Advanced Interventional Sys., Inc.*, 824 F. Supp. 583 (E.D. Va. 1993). Most of the cases cited, however, based this finding on a previous edition of the federal patent statutes which has since been amended to add the phrase "in the course of sell[ing] or offer[ing] to sell" to the definition of patent infringement. In light of this amendment, in some instances patent infringement may indeed constitute "advertising injury" and the cases cited by Defendant Insurers are not controlling.

concerns the method of conveyance there is no "misappropriation of an advertising idea."

This distinction is best understood in application. In *Amazon*, the reviewing court found there to be a "misappropriation of an advertising idea" where the patented idea, interactive music preview technology, was itself an element of the complained of advertisement. 85 P.3d at 977. The complained of advertisement incorporated the music preview technology – the technology was not simply a means of conveyance. Similarly, in *Hyundai* the 9th Circuit found "misappropriation of an advertising idea" where the complained of advertisement incorporated the patented technology, an electronic system allowing consumers to create customized product proposals, into the content of the challenged advertisement. 600 F.3d at 1101.

In stark contrast, in *Discover Financial* the court found no coverage where the alleged infringement involved many of the same patents at issue in the Katz complaint. 527 F. Supp. 2d 806. Although *Discover Financial* is distinguishable from the complaint and arguments relating to this action, the court's reasoning is nonetheless relevant.[18] The court found the ideas protected by the Katz patents were not incorporated as elements of the alleged "advertising" – on the contrary the court found the ideas protected by the Katz patents were means of conveying the alleged advertisements. As the court noted, "[u]sing or selling automated telephone systems that have the ability to advertise goods or services or solicit business does not itself involve any elements of advertising." *Id.* at 824.

---

[18] Although the underlying complaint in *Discover Financial* omitted the Katz patents at issue in this case which specifically include claims relating to advertising, this factor was not essential to the ultimate finding. Furthermore, the passing reference to "advertising" in a few of the many claims in the allegedly infringed patents does not convert these patents into an "advertising idea." They merely refer to a potential use of the technology, reaffirming the fact that these patents concern a means of conveying and communicating information – not an advertising technique.

As in *Discover Financial*, the patents-in-suit at issue in the Katz complaint concern technologies relating to interactive call processing. The Katz complaint characterizes DISH's alleged infringing use of these technologies as part of "automated telephone systems . . . that allow their customers to perform pay-per-view ordering and customer service functions over the telephone." Katz Amended Complaint, Doc. 62-2 at 9. The Katz complaint focuses on DISH's use of these patented technologies as a means of conveying content to and tailoring its interactions with its customers. It does not allege that the patented technologies are themselves incorporated as an element of DISH's communications and interactions with its customers. The complained of conduct does not, therefore, constitute "misappropriation of an advertising idea" within the meaning of the contested insurance policies.

### ii. Misappropriation of Style of Doing Business

A majority of courts have concluded that "style of doing business" means a company's "comprehensive manner of operating its business." *See, e.g., Novell,* 141 F.3d at 987 (collecting authorities). Some courts find the term synonymous with the misappropriation of the contested product's trade dress – its overall image and appearance, including features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques. *See Discover,* 527 F. Supp. 2d at 825 (citing *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1189 (11th Cir. 2002); *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992)). Other courts offer variations of the generally endorsed meaning with the basic connotations remaining largely the same. *See Green Mach. Corp. v. Zurich-American Ins. Group*, 313 F.3d 837, 840-41 (3d Cir. 2002) ("style of doing business" refers to a company's "marketing approach"); *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 748-50 (3d Cir. 1999) (finding that "style of

18

doing business" refers to "a plan for interacting with consumers and getting their business");

*Elcom Techs., Inc. v. Hartford Ins. Co. of the Midwest*, 991 F. Supp. 1294, 1297 (D. Utah 1997)

(endorsing "comprehensive manner of operating its business" definition and observing that "acts

by one company might amount to a comprehensive manner of operating its business while the

same acts by another company may only be considered representations to the public about the

company's product or service").

It is unnecessary to construe definitively the phrase "style of doing business" because

none of the above-described definitions provide relief to DISH. DISH's use of the patented

technology as a means of communicating and interacting with its customers fails to constitute a

misappropriation of a "style of doing business" because DISH did not misappropriate the manner

in which Katz conducts its business, but rather the technologies themselves. The Katz patents

teach a method of communication generally, not an idea, plan, or strategy developed by Katz for

the specific purpose of conducting its own business. In other words, because the patented

technology is not itself a marketing approach of Katz's, DISH did not misappropriate Katz's

"style of doing business" through its patent-infringement.

Because DISH's alleged infringement of the patents-in-suit does not constitute

"misappropriation of advertising ideas or style of doing business," there is no "advertising

injury" within the meaning of the contested CGL policies.[19] Accordingly, Defendant Insurers are

not obligated to defend DISH in the Katz lawsuit.

3. *There Must be a Causal Connection Between the Covered Injury and the Advertising*

As noted *ante*, even if there were an "advertising injury," there would be coverage only

---

[19] DISH does not argue and I need not address whether the complained of activity falls under the other three definitions of "advertising injury."

where the "advertising injury" is caused by an "occurrence," "an offense committed in the course of advertising your goods, products and services that results in 'advertising injury.'" There is a significant disagreement on what standard is used for determining whether an "occurrence" has actually caused the complained of "advertising injury." *See Frog, Switch & Mfg. Co.*, 193 F.3d at 750 n.8. Some courts apply a heightened standard, finding no causation if advertising is merely one among many activities giving rise to the complained of injury. *See Fluoroware, Inc.*, 545 N.W.2d at 681-82. Other courts find causation even where there are multiple activities giving rise to the complained of injury if, standing alone, the "advertising" would give rise to the complained of injury. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 339 n.3 (9th Cir. 1996) (finding causation where "the injury emanates within the advertisement itself and requires no further conduct"). I need not resolve this disparity, however, because there is no "covered injury." [20]

### *D. Conclusion*

As one court has noted, "the definition of 'advertising injury' in standard business insurance policies has troubled and in some cases confounded courts for years," but this does not necessarily give rise to coverage, or even a possibility of coverage. *Frog, Switch & Mfg. Co.,* 193 F.3d at 744. In certain cases, a claim of patent infringement may properly give rise to coverage, or even the specter of coverage, such that an insurer will have a duty to defend. Where an underlying complaint fails to allege that an insured party has incorporated a patented advertising technique into its own advertisements, however, coverage does not lie. The Katz

---

[20] Similarly, I need not address National Union's argument that its policy limits coverage to injury "arising solely out of" advertising activities; Arch's argument that its patent injury exclusion bars coverage; or the umbrella carriers argument that they have no duty to defend or indemnify until the primary coverage limits have been exhausted.

complaint does not allege that DISH has incorporated its patented ideas into its advertising activities. Accordingly, Defendant Insurers' Motions for Summary Judgement, Docs. 62, 65, 66, 68, and 72, are GRANTED. Because there is no duty to defend, there can be no duty to indemnify, breach of contract, breach of the covenant of good faith and fair dealing, or bad faith. *See Constitution Assocs.*, 930 P.2d at 563; *Lextron, Inc. v. Travelers Cas. & Surety Co. of Am.*, 267 F. Supp. 2d 1041, 1048 (D. Colo. 2003). Accordingly, judgment shall be entered in favor of Defendant Insurers, each party to bear its own costs.

Dated: August 19, 2010                                    By the Court:

                                                          **/s/ John L. Kane**
                                                          Senior U.S. District Judge