# UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **09-cv-00447-JLK**

**DISH NETWORK CORPORATION, and**
**DISH NETWORK LLC,**

      Plaintiffs,

v.

**ARCH SPECIALTY INSURANCE COMPANY,**
**ARROWOOD INDEMNITY COMPANY,**
**TRAVELERS INDEMNITY COMPANY OF ILLINOIS,**
**XL INSURANCE AMERICA, INC., and**
**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,**

      Defendants.

---

## MEMORANDUM ORDER AND OPINION ON REMAND

Kane, J.

      This insurance coverage dispute is before me on remand from the

Tenth Circuit Court of Appeals' reversal of my earlier opinion granting

summary judgment in favor of Defendants.  Defendants again move for

summary judgment and Plaintiffs cross-move for the same.[1] At issue is

whether the Defendants, each a primary or excess insurer, owe the Plaintiffs,

DISH Network Corporation ("Dish Corp.") and DISH Network L.L.C. ("Dish

LLC"), collectively "DISH,"[2] a duty to defend or indemnify claims made against

---

[1]DISH moves for summary judgment against Arrowood and Travelers, the primary insurers only.  All
Defendant Insurers move for summary judgment against DISH.
[2] In an effort to avoid clumsy language, I treat DISH as singular for purposes of grammatical
construction.  The Defendants are collectively referred to as "Defendants," "Defendant Insurers," or

1

them in an action styled *Ronald A. Katz Technology Licensing, L.P. v. EchoStar Communications Corp. and EchoStar Satellite L.L.C.*, Case No. C-07-03151 WDB (N.D. Cal.) (the "Katz Action" or the "RAKTL Action").

In my original summary judgment ruling I held that DISH's injuries in the Katz Action were not "advertising" injuries such that coverage would lie per the "advertising injury" coverage provisions in the applicable insurance policies issued by the Defendants.  The Tenth Circuit Court of Appeals reversed that holding, providing in pertinent part: "As regards the duty to defend, we hold that the RAKTL complaint 'may arguably fall within the polic[ies]' at issue, because it potentially alleged advertising injury arising from Dish's misappropriation of its advertising ideas, which Dish committed in the course of advertising its goods, products, or services." *DISH Network Corp. v. Arch Specialty Ins. Co.*, 659 F.3d 1010, 1028 (10th Cir. 2011) (quotation and citation omitted). The Tenth Circuit reversed the case, directing me to consider three issues that the Excess Umbrella Insurers had raised both on appeal and previously at the district court level.[3]  Specifically, these issues are: (a) whether the intellectual policy exclusion in Arch's policy precludes coverage; (b) whether the sole causation requirement in National

---

"Insurers," where all Defendants are implicated, and as "Excess Insurers " or "Umbrella Insurers" or "Primary Insurers" as needed where a distinction between the two types of insurance is required.

[3] Because the remanded issues were irrelevant to the "advertising injury" duty to defend analysis, they were neither discussed nor decided in the first opinion, and the Tenth Circuit explicitly "express[ed] no view on the merits" of these matters, mentioning them only by way of directing that they be considered on remand.

Union's policy precludes coverage; and (c) whether any of the Excess Insurers have a duty to defend in the absence of a showing that DISH's primary policy coverage has been exhausted. *Id*. at 1028-29.

In the course of the instant summary judgment filings, DISH concedes that Arch's intellectual property exclusion bars any duty to defend Arch might have regarding the Katz Action. Docs. 173 and 188. Accordingly, issue (a) is resolved and summary judgment is GRANTED *instanter* as to Arch. As before, however, issues (b) and (c) require first a decision that a duty to defend would exist otherwise.

Relying on the Court of Appeals' phrase beginning: "As regards the duty to defend, we hold that the RAKTL complaint 'may arguably fall within the polic[ies]' at issue. . .," DISH Network, 659 F.3d at 1028 (quotation omitted), DISH posits that the Tenth Circuit has "already decided" that the claims asserted against DISH Network in the underlying Katz Action fall potentially within the coverage of the primary insurers commercial general liability ("CGL") policies. Doc. 169 at p.7.

From the fact that I let Insurers raise new defenses, however, it is clear the duty to defend issue was not definitively closed forever and always by the Tenth Circuit opinion. The first incarnation of this case involved determining whether the complained of action in the underlying litigation, specifically patent infringement of telephone technology, constituted "advertising injury"

such that Defendants' various "advertising injury" exclusions would apply and preclude Defendants having a duty to defend.  Although the Tenth Circuit did indeed settle that patent infringement for technologies capable of serving as conduits for advertising could constitute "advertising injury," the case as presently postured does not seek to parse what is or is not an "advertising injury."

Rather, the instant summary judgment motions foremost query what import to assign the term "broadcast" in an insurance policy, Defendants each now invoking various Business Exclusions to negate coverage for all advertising injuries suffered by insureds involved in the business of broadcasting.  "Although a district court is bound to follow the mandate, and the mandate controls all matters within its scope,…a district court on remand is free to pass upon any issue which was not expressly or impliedly disposed of on appeal."  *Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1126 (10th Cir. 2003); *Aguinaga v. United Food & Commercial Workers Int'l Union*, 854 F.Supp.757, 773 (D. Kan. 1994)("The issue presented by the Union was not resolved by the Tenth Circuit in the prior appeal, and the court does no violence to the mandate rule by considering the issue herein.")  Accordingly, because the Business Exclusion argument was never before the Tenth Circuit, it is appropriate for consideration on remand.

As detailed below, I find the business in which DISH is engaged to fall squarely within the meaning of "broadcasting," such that coverage for defending the Katz Action is unavailable under the policies issued to it by Defendant Insurers.  Nonetheless, per the Tenth Circuit's express directions, I shall also discuss National Union's sole causation requirement and Excess Insurers' argument that they had no duty to defend absent DISH's conclusive demonstration that primary coverage had been exhausted.  In addition, I will briefly treat various other legal arguments that were similarly left open on remand, including National Union's so-called Satellite Exclusion Endorsement argument.

*Summary Judgment Standard and Rules of Insurance Contract Interpretation[4]*

I repeat the catechism that summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Here, the material facts are not in dispute and the resolutions of all the summary judgment motions hinge upon questions of law, specifically questions of insurance contract interpretation.  That said, where legal conclusions require me to draw inferences from the factual record, I review the record in a light most favorable to the non-moving party. *Novell, Inc. v. Fed. Ins. Co.*, 141 F.3d 983, 985 (10th Cir. 1998).

---

[4] The jurisdiction, choice of law, and venue discussions set forth in my original opinion are here incorporated by reference.

The meaning of each term in an insurance contract is to be determined as a matter of Colorado law, with any ambiguity resolved in favor of DISH, as the insured. *See Pompa v. Am. Family Mut. Ins. Co.*, 520 F.3d 1139, 1141 (10th Cir. 2008). Mere disagreement between the parties about the meaning of a term, however, does not create ambiguity. *Union Rural Elec. Ass'n v. Public Utils. Comm'n,* 661 P.2d 247, 251 (Colo.1983). One may not read an ambiguity into a term where none exists in order then to resolve the resulting ambiguity against the insurer. *Martinez v. Hawkeye–Sec. Ins. Co.*, 576 P.2d 1017, 1019 (Colo. 1978) ("[C]ourts will not force an ambiguity in order to resolve it against an insurer."). Also, the mere fact that a term may be susceptible to multiple interpretations, or that it may have different dictionary definitions in different contexts, does not alone create an ambiguity. *See id.*; *see also Allstate Ins. Co. v. Juniel*, 931 P.2d 511, 513 (Colo. App. 1996). To the contrary, and as a matter of basic semantics, a term is only ambiguous when it is reasonably susceptible to multiple interpretations in the context in which it is used. *Juniel*, 931 P.2d at 513.

To ascertain whether a certain provision is ambiguous, "the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed, and reference must be made to all the provisions of the agreement." *Radiology Professional Corp. v. Trinidad Area Health Ass'n,* 195 Colo. 253, 256, 577 P.2d 748, 750

(1978)(citing *Christmas v. Cooley,* 158 Colo. 297, 406 (1965)).  Not only should strained constructions be avoided in favor of common constructions, but technical and legal definitions should also be avoided.  In other words, the plain meaning of the words should be employed in a lay manner consistent with what would be understood by a person of ordinary intelligence.  *Safeco Ins. Co. of Am. v. Robertson*, 994 P.2d 488, 490 (Colo. App. 1999).

To determine whether an insurer has a duty to defend the insured, Colorado courts follow the "four corners rule" or "complaint rule," under which the courts compare the allegations of the underlying complaint with the applicable policy terms.  *DISH Network*, 659 F.3d at 1015.  Where the underlying complaint alleges any facts or claims that might possibly be covered under the policy terms, the insurer must tender a defense.  *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 301 (Colo. 2003).The Colorado Supreme Court has explained that the four corners or complaint rule's purpose is to protect the insured's 'legitimate expectation of a defense.'" *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 828 (Colo.2004)(quoting *Hecla Mining Co. v. N.H. Ins. Co.,* 811 P.2d 1083, 1089 (Colo.1991)). While the "four corners" or "complaint" rule generally bars the admissibility of evidence extrinsic to the underlying complaint and the relevant insuring agreements in coverage determinations, a "widely recognized exception" to this rule allows a court to consider such evidence

where it is unrelated to the merits of the underlying litigation and "plainly take[s] the case outside the policy coverage." *Pompa*, 520 F.3d at 1147 (internal quotation marks omitted). While the Colorado state courts have not as yet expressly adopted this exception, the Tenth Circuit has determined that, in light of the "authoritative support" for this rule and supporting dicta, the Colorado Supreme Court likely would adopt the exception. *Id*.[5]

Overall, to the extent possible, courts should "give effect to the reasonable expectations of the insured." *DISH Network*, 659 F.3d at 1016 (citations omitted).

### Statement of Facts[6]

This Court's Memorandum Opinion and Order on summary judgment (Doc. 135) set forth the relevant facts of the underlying patent suit and the policies issued by the Defendants.  CITE Slip Op. at pp. 3-4.  Those facts remain undisputed. The following additional facts are relevant to the present motions:

1.   The Travelers and  Arrowood policies contain the following

    exclusion with respect to "advertising injury" coverage:

        COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

---

[5] While there is no authoritative state law on point, the *Pompa* court's prediction of the Colorado Supreme Court's holding is binding here. *See Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)("[W]hen a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.")
[6] The majority of the facts are undisputed by the parties.  Those few that are not are proven conclusively by the exhibits such that no dispute is "genuine."

...2. Exclusions.

This insurance does not apply to:

...b. "Advertising injury" arising out of:

. . . (4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

Travelers' Policy, Ex. D1 to Doc. 166 at pp. 10, 18.; Arrowood's Policy, Ex. E-4 to Doc. 168 at DN 00035-36.

2.   The National Union policy contains the following exclusion with respect to "advertising injury" coverage:

V. Exclusions

This insurance does not apply to:

... L    Advertising Injury arising out of:

... (4) An offense committed by an Insured whose business is advertising, broadcasting, publishing or telecasting.

National Union's Policy, Ex. A-3 to Doc. 167 at NU00023.

3.   The Arch Policy also contains an exclusion concerning advertising injury:

This insurance does not apply to, and [Arch] ha[s] no obligation to investigate, settle or defend, or pay the cost of defending, any claim or "suit" for:

9

> "Personal and advertising injury" ... [c]omitted by an
> insured whose business is [a]dvertising, broadcasting,
> publishing, or telecasting; [or a]n Internet search, access,
> content or service provider.

Ex. B-2 to Doc. 170 at ¶ 2.a(10)(a), (c).

4.  The Annual Report of EchoStar Communications Corporation (the predecessor to DISH) for the year ended 12/31/03 contains an S.E.C. form 10-K/A (Exhibit D2 hereto) states, *inter alia*, that DISH "...provides a direct ***broadcast*** satellite subscription television service. . .". *Id.* at p. 3 (emphasis added).

5.  The Articles of Incorporation of EchoStar Satellite Corporation (which became DISH) describe its business operations in relevant part as follows:

> ... To engage in the business of satellite
> communications, including but not limited to Direct
> ***Broadcast*** Satellite communications: to . . . operate
> transmission and receiving stations and any
> connection between any such stations, and to
> transmit signals, and all matter and things of any
> kind, nature, and description whatsoever that may
> be transmitted.

10

Articles of Incorporation, Exhibit D4 to Doc. 166 at p. 1(emphasis added).

6.  DISH's website refers to what it does as broadcasting.  For example, the "milestones" page of its website refers to making its "first ***broadcast*** to customers" in March 1996 and to doubling its "***broadcasting*** capacity" in 1998.  Doc. 175 at p. 7 & Doc. 185 at p.4 (emphasis added).

7.  In a recent lawsuit in which DISH was a Plaintiff, DISH states the following in its Complaint:

> … 9. DISH Network is a multi-channel video provider that delivers video, audio, and data services via a direct ***broadcast*** satellite system to more than 14 million subscribers.
>
> 10. DISH Network uses high-powered satellites to ***broadcast***, among other things, movies, sports and general entertainment services to consumers . . .

Complaint, Case No. CV11-07376, United States District Court for the Central District of California, Western Div., *Dish Network, LLC et al vs. Terrazas*, Exhibit D6 to Doc. 166 at p. 3 (emphasis added).

8.  Beginning at least with its May 3, 2001 "Risk Management Solutions" proposal, DISH's insurance broker, The Lockton Companies, advised DISH of the availability of "Broadcasters Errors

& Omissions Coverage, " which coverage the broker said "would benefit [DISH] in the event of a claim." Ex. E-14 to Doc. 168, EchoStar Risk Management Solutions, at DN 04036.

9.   Lockton's "Insurance Program Proposal" for EchoStar Communications Corporation, dated July 26, 2001, listed "Personal Injury and Advertising Injury Coverage" for "[a]ny offense if the insured is in the business of advertising, broadcasting, or telecasting" as one of several "MAJOR EXCLUSIONS" in EchoStar's commercial general liability coverage. Ex. E-15 to Doc. 168, EchoStar Insurance Program Proposal 8/1/2001 - 8/1/2002, at DN 04105.

10. The same document listed "Broadcasters Errors and Omissions" coverage as one of a number of "Items to Discuss" with EchoStar. *Id.* at DN 04181.

11. Lockton's "Insurance Proposal," dated July 16, 2002, similarly described EchoStar Communications Corporation's "advertising, broadcasting, or telecasting" exclusion as being a "MAJOR EXCLUSION[]" and an "ITEM TO DISCUSS[]." Ex. E-16 to Doc. 168, Insurance Proposal for EchoStar 8/1/2002 - 8/1/2003, at DN 05468, 05489-90.

12. On October 30, 2002, Lockton provided Jennifer Palasz, DISH's

Treasury Manager and Director of Treasury and Risk, with a similar

"Insurance Summary," dated October 25, 2002, also explicitly listing

broadcasting and telecasting coverage as a "MAJOR EXCLUSION."

Ex. E-17 to Doc. 168, 10/30/02 Letter and Insurance Summary for

EchoStar Communications Corporation, at DN 05396.

*Discussion*

<u>The Business Exclusion for Broadcasting Precludes Coverage</u>

The policies issued by Travelers and Arrowood use standard primary

CGL coverage forms promulgated by the Insurance Service Office, Inc., or

"ISO." These coverage forms reflect that though commercial insureds

generally can obtain "advertising injury" coverage for their business

operations, insurers generally do not afford such coverage to insureds in the

business of advertising, broadcasting, publishing or telecasting.  As set forth

above, the pertinent provision reads:

This insurance does not apply to:

...b. "Advertising injury" arising out of:

.            . . (4) An offense committed by an insured whose business is

advertising, broadcasting, publishing or telecasting.

Travelers' policy, Ex. D1 to Doc. 166 at pp. 10, 18.; Arrowood's Policy, Ex. E-4

to Doc. 168 at DN 00035-36.

The Insurers assert that because DISH is a direct satellite broadcaster, it is primarily in the business of broadcasting[7], and therefore not covered for advertising injuries. DISH argues that the satellite television programming it provides should not be considered "broadcasting" because it is a subscription service not available to the "indiscriminate public" or the "public generally." DISH defends this position by cherry-picking dictionary definitions of "broadcast" that include a public component[8] and relying on narrow, technical definitions contained in the Federal Communications Act of 1934. DISH's arguments fail for several reasons.

First, the common understanding of "broadcasting" is synonymous with "transmission." *National Ass'n for Better Broad. (NABB) v.* FCC, 849 F.2d 665, 669 (D.C.Cir.1988). There is no question that DISH transmits, via broadcast satellites, television programming to its subscribers. One never hears a conversation around the water cooler in which a person states that he could not possibly have watched a broadcast because he only watches cable television or has a satellite television subscription. Courts also routinely employ the verb "broadcast" to describe what a for-pay television provider

---

[7] No Insurer's policy defines the terms "broadcasting" or "telecasting." Accordingly, as explained *infra* at p. 6-7, I apply general contract principles and avoid strained and technical interpretations to accord the terms in question their plain and ordinary meanings. *See Kane v. Royal Ins. Co. of Am.*, 768 P.2d 678, 680 (Colo. 1989); *Safeco Ins. Co. of Am. v. Robertson*, 994 P.2d 488, 490 (Colo. App. 1999)(in determining meaning of provision denying coverage for liability involving boats with over "50 or more total horsepower," court looked to what horsepower the boat was represented to have, not the specialty industry custom of measuring output at the propeller)

[8] For example, DISH cites to Webster's Third New International Dictionary 280 (2002) to offer that "broadcast" means to be "made public by means of radio or television."

does and the noun "broadcaster" to describe what the for-pay television provider is. *See Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413, 420 (Tex.2000)(repeatedly stating that premium television channel HBO "broadcast" the film at issue in defamation suit and that HBO is a "broadcaster"); *Orth-O-Vision, Inc. v. Home Box Office (HBO)*, 474 F.Supp. 672, 675 (S.D.N.Y.1979)(concluding that HBO is a "broadcaster" by reasoning that even though HBO transmissions are not freely available to the general public, they are broadcasts because they are capable of reaching any member of the general public willing to pay a fee, similar to conventional broadcast fare, and intended to appeal to a mass audience).  Nothing in the case law or the common usage of the term "broadcasting" requires that every member of the public actually see what is broadcast or have access to the broadcast for free before the broadcast will be considered directed toward the "public at large." It is enough for the broadcast or telecast to be readily available to the public at large, and certainly DISH strives for universal access.[9]   Accordingly, I hold that the plain meaning of broadcasting includes the business of providing satellite television programming, in which DISH is primarily engaged.[10]

---

[9] In its 2001 Form 10-K filed with the SEC, DISH reported that its goal was "maximizing future revenue by selling DISH Network programming to the largest possible subscriber base and rapidly increasing the size of that subscriber base."  Ex. E-19 to Doc. 175 at p. 4.

[10] As DISH's subscription television service business accounted for between 90 and 94 percent of its overall revenue throughout the period of policy coverage at issue, *see* Ex. E-8 to Doc. 168, DISH 2003 10-K at DN 06451), it is indisputable that DISH is "primarily" engaged in broadcasting.

I furthermore reject DISH's argument that because a federal court upheld a statutory interpretation of the term "broadcasting" that takes subscription television providers outside of the FCC's regulatory purview, the plain, ordinary meaning of the term "broadcasting" cannot apply to subscription television providers.  The fact that subscription television is classified as a non-broadcast service for purposes of the Federal Communications Act says nothing about the plain, ordinary meaning of the term "broadcasting" in general.  Colorado law dictates that terms be interpreted according to the understanding of the average purchaser of insurance, and it is irrelevant that "broadcasting" has a statutory definition in a regulatory scheme that excludes satellite television providers.  I hold that the average purchaser of insurance would consider DISH engaged primarily in the business of broadcasting.

Second, DISH's own characterization of its subscription business is that of and involving "broadcasting." DISH, *inter alia*, represents its business as providing a "direct broadcast satellite subscription television service."  DISH's website refers to its first transmission of television programming to customers in March of 1996 as being its "first broadcast to customers" and describes its purchase of a "satellite broadcasting joint venture" as "doubling its "broadcasting capacity."   For DISH to hold itself out to the public and the courts as a "broadcaster" but then deny the same to avoid its insurers'

broadcasting exclusion, smacks of hypocrisy and not common sense or understanding.

Third, DISH's attempt to draw a distinction between subscription and non-subscription television fails because it makes no sense in the context of the Business Exclusion. The reason for an insurance policy to include an exclusion for insureds in the businesses of "advertising, broadcasting, publishing or telecasting" is to limit the insurer's exposure to mass media-type injuries.[11]   The extent of that risk is a function of how many people have access to the media, not whether they pay for it. Both PBS and DISH are mass media businesses,[12] and whether it is PBS broadcasting a slanderous statement or DISH broadcasting a slanderous statement, each entity presents a risky enterprise for purposes of advertising coverage.[13]

This context also gives reason to reject DISH's reliance on its dictionary definitions.  I concede that the dictionary definitions DISH proffers include a public dissemination requirement in their composition of the meaning of broadcasting.  But as the Insurers equally submit many dictionary definitions

---

[11] Shaun McParland Baldwin et al. explain the risk and the rationale for the exclusion in *Commercial General Liability Coverages-An Overview*, 707 PLI/Lit 83, 188 (2004):

> The insureds in [the advertising, broadcasting, publishing or telecasting] line of business should procure media, broacasters or publishers liability policies *to cover their enhanced risk in the media-related marketplace*...This addition recognizes that *these types of insureds also present a heightened risk of "person and advertising injury," which should be addressed by  separate insurance products.*

(emphasis added.)
[12] DISH has over nine million subscribers. *See* Doc.  175 at p. 6.
[13] Indeed, DISH customers who subscribe to a local channels package can receive PBS transmissions over their DISH satellite.

that do not include that component[14], I do not here find dictionaries particularly helpful.  Dictionary definitions can certainly provide interpretative guidance for a term, and I freely admit to have turned to them in the past, but it is important to remember that the dictionary definitions provide just that, *guidance*.  "Dictionary definitions are acontextual, whereas the meaning of sentences depends critically on context, including all sorts of background understandings."  *United States v. Costello*, 666 F.3d 1040, 1043 (7th Cir.2012).

 *Pompa* is illustrative.  That case involved an insurer that refused to defend or indemnify its insured, David Pompa, for claims arising out of an altercation in which another man was killed.  Pompa pleaded guilty to criminally negligent homicide in relation to that death, and the insurer invoked an exclusion barring claims arising from criminal acts for which the insured was "convicted." 520 F.3d at 1141.  Pompa filed an action for breach of contract and bad faith in Colorado state court, which the insurer removed to this District. *Id*.  In resisting the insurer's motion for summary judgment, Pompa maintained that the word "convicted" was ambiguous because it was susceptible to two definitions: It could refer to a "conviction" obtained through trial or to a "conviction" obtained by plea. *Id*. at 1143. Notwithstanding that Pompa and the insurer each cited various editions of

---

[14] For example, Insurers cite The American Heritage Dictionary of the English Language, New College Ed., Houghton Mifflin Co. (1976) as defining "broadcast" as "-- intr. To broadcast by television... -- tr. To broadcast (a program) by television."

Black's Law Dictionary for conflicting definitions of the same word, the

district court declined to find any ambiguity in the term "convicted" as it was

used in context within the policy exclusion, granting summary judgment to

the insurer. *Id.* at 1142-43.

In affirming, the Tenth Circuit observed that "[a] word may take on a

variety of meanings in different contexts," but that the mere existence of

multiple definitions does not render a term ambiguous if its meaning is

otherwise clear in the context in which it is used within an insurance policy.

*Id.* at 1143.  Quoting the Wisconsin Supreme Court in *Sprangers v. Greatway*

*Insurance Co.*, the Pompa court observed:

> The mere fact that a word has more than one dictionary
> meaning, or that the parties disagree about the meaning,
> does not necessarily make the word ambiguous if the court
> concludes that only one meaning applies in the context and
> comports with the parties' objectively reasonable
> expectations. . . . Thus it is inappropriate to create ambiguity
> by simply finding two different dictionary definitions . . .
> Dictionary definitions can shed only partial light on the
> reasonable understanding of an insured with regard to
> words in the context of a particular insurance policy.

*Pompa*, 520 F.3d at 1143 (quoting *Sprangers*, 514 N.W.2d 1, 7 (Wis. 1994)).

Rather than finding an ambiguity based on the conflicting dictionary

definitions offered by the parties, the Tenth Circuit looked to the policy

purpose for the exclusion at issue - to bar coverage for criminal acts – in

determining that the word "convicted" remained unambiguous. According to

the *Pompa* court, there was no policy reason for limiting the exclusion to acts

for which a trial had been had, or for it not to apply to acts for which a guilty plea had been tendered. *Id*. at 1143-44.  Therefore, the Court concluded that the term was unambiguous and was not reasonably susceptible to Pompa's preferred interpretation that being "convicted" required a trial and verdict. *Id.*

To the extent that DISH maintains that the word "broadcasting" is susceptible to an interpretation that would distinguish traditional television transmission from subscription- or satellite-based television transmission, I reject that interpretation because the distinction is not supported by the underlying risk.

Additionally, I note Insurers advance documentation of their broker's advice, which explicitly warned DISH that it would not be covered for many injuries because of the Broadcasting Exclusion.  DISH argues that this extrinsic evidence is inappropriate for consideration because of Colorado's "four corners" or "complaint" rule.   That rule, however, is about where courts should look to ascertain the *facts* potentially giving rise to a duty to defend; it is not about how to define the terms of a policy, which remains a question of law appropriate for determination on summary judgment.

The broker's advice is admissible under an exception to the four corners rule. The Tenth Circuit has explicitly held that an exception would be recognized where it would (1) not "undercut the purposes" underlying the rule and (2) be supported by sufficient authority. *Pompa*, 520 F.3d at 1147;

*AIMCO*, 593 F.3d at 1194.  Extrinsic evidence constituting "an indisputable fact that is not an element of either the cause of action or a defense in the underlying litigation" is admissible. *Pompa*, 520 F.3d at 1147.  Here, as no party disputes the veracity of the broker's statements, there is no reason to doubt that they constitute "sufficient authority."  Also, neither the elements of the charges brought in the underlying patent infringement complaint nor DISH's defenses have anything to do with whether DISH is in the business of broadcasting.  Finally, application of the rule to exclude the broker's advice would defeat the Colorado Supreme Court's very object in creating the rule. As DISH itself highlights in its briefing, the rule exists to "protect[] the insured's 'legitimate expectation of a defense.'"  *Cotter*, 90 P.3d at 829 (quoting *Hecla,* 811 P.2d at 1090).  How can DISH assert it had a "legitimate" expectation of a defense when it was literally instructed *not* to expect a defense? All together, these facts make the broker's advice admissible.

Indeed, the Tenth Circuit in this very dispute has cited approvingly to *Pompa* and stated that "a Colorado court might well consider the substance" of the extrinsic evidence that is the content of the Katz Action patent claims not at issue in the underlying suit. *DISH Network*, 659 F.3d at 1016.  Admitting the broker's advice is merely following the Tenth Circuit's suggestion with respect to a different category of evidence that was not before the Tenth Circuit. The evidence shows that DISH was informed unequivocally that the

Insurers believed the Broadcasting Exclusion applicable.  If DISH disagreed, it was then that it should have raised the issue.  DISH could have purchased additional coverage, but it chose not to.  DISH should not get the benefits of a product it did not purchase. "Courts may neither add provisions to extend coverage beyond that contracted for, nor delete them to limit coverage." *Cyprus*, 74 P.3d at 299. Here, I would be adding coverage were I to rule in DISH's favor.

It also bears repeating that an insurance policy is a contract, and is generally subject to the standard rules of contract interpretation.  *Cyprus*, 74 P.3d at 299.  Accordingly, one may properly consider extrinsic evidence in determining whether an ambiguity exists. *Level 3 Communications, LLC v. Liebert Corp.*, 535 F.3d 1146 (10th Cir.2008).  As such, even were I *not* to hold that the plain meaning of "broadcasting" unambiguously refers to what business DISH is engaged, I would consider the broker's advice to conclude that the parties expected the Business Exclusion to apply, which consideration would not violate the four corners rule as described above.

<u>The Business Exclusion for Telecasting Precludes Coverage</u>

Even were DISH's business to be construed as ambiguous or something other than "broadcasting," it continues to be excluded from Advertising Injury coverage under the Business Exclusion as an "insured whose business is . . . telecasting."  The incorporation of the term "telecasting" – in addition to the

22

broader and partially overlapping term "broadcasting" –reflects the insurer's ceaseless quest to draft language definite enough to satisfy the pro-insured tilt of the law.  The term "telecasting" is included to make clear that businesses involving the transmission of television programming (as opposed to only radio broadcasting, for example) to viewers are excluded from advertising injury coverage.

DISH fails to account for the inclusion of this specific additional term within the Business Exclusion, attempting instead to persuade that it is subsumed within the "broadcasting" portion of the exclusion. DISH defines "telecasting" only by reference to broadcasting, specifically maintaining that it means no more than "to broadcast by television." Doc. 169 at p.19.  Equating the two terms to this extent, however, would nullify the inclusion of "telecasting" as an additional term, effectively reading it out of the Business Exclusion.  This interpretative approach is inconsistent with the basic rule of contract construction that each term in the policy should be read to have independent meaning. *See Progressive Specialty Ins. Co. v. Hartford Underwriters Ins. Co.,* 148 P.3d 470, 474 (Colo. App. 2006) ("We also read the provisions of the policy as a whole and construe it so that all provisions are harmonious and none is rendered meaningless.") Thus, to the extent the Insurers offer a competing interpretation of these

terms that gives each independent meaning, it must be adopted and

DISH's redundant interpretation must be rejected.

<u>National Union and XL's Duties as Secondary Insurers</u>

Unlike Arrowood and Travelers, National Union and XL do not insure

DISH under a primary CGL policy.  Instead, National Union and XL serve as

DISH's umbrella insurers. An umbrella insurance policy is a distinct type of

policy in which an insurer has a duty to defend where (1) the applicable limits

of insurance of the underlying policies have been exhausted by payments of

claims to which the umbrella policy applies; or (2) damages are sought that

are covered by the umbrella policy but not covered by any other underlying

insurance. *See Apodaca v. Allstate Ins. Co.*, 255 P.3d 1099, 1103 (Colo. 2011).

The Katz Action satisfies neither scenario under either National Union's or

XL's policy.

As to the limit exhaustion requirement, DISH concedes that the CGL

insurance policies issued by Travelers and Arrowood have not been

exhausted by payments of claims to which the National Union and XL policies

apply.  Doc. 173 at p.50.  As to the other coverage requirement, National

Union and XL have no duty to defend because their policies, like those of the

primary insurers, contain exclusions for advertising injuries where the

insurer is engaged in the business of "broadcasting."  National Union's policy

contains the exclusion explicitly and XL's policy contains the exclusion by

reference.  That is, regardless of whether the applicable limits of the underlying policies have been exhausted, the National Union and XL Policies themselves do not cover defense costs for the injuries alleged in the underlying litigation.  Furthermore, National Union's policy contains a "sole" causation requirement, discussed immediately below, that negates coverage. Lastly, and though ultimately irrelevant to this matter's disposition, National Union's Satellite Exclusion and XL's "as warranted" provision also fails to provide coverage.

<u>The Katz Action Complaint Fails to Meet National union's Sole Causation Requirement</u>

The relevant policy language regarding National Union's Sole Causation requirement is as follows:

**A. Advertising Injury** means injury arising solely out of your advertising activities as a result of one or more of the following offenses:

**1**. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**2.** Oral or written publication of material that violates a person's right of privacy;

**3.** Misappropriation of advertising ideas or style of

doing business; or

**4.** Infringement of copyright, title or slogan.

* * *

**H. Occurrence** means:

* * *

**3.** As respects **Advertising Injury,** an offense

committed in the course of advertising your

goods, products and services that results in

**Advertising Injury.** All damages that arise

from the same or related injurious material or act

shall be considered as arising out of one

**Occurrence,** regardless of the frequency or

repetition thereof, the number and kind of media

used and the number of claimants.


* * *

This insurance does not apply to ...

**L**. Advertising Injury arising out of. ..

4. An offense committed by an Insured whose

business is advertising, broadcasting,

publishing, or telecasting ...

Commercial Umbrella Policy Form 57697 (6/93) at NU00059, NU00061, and NU00064.)

As indicated above, National Union's policy language states that its Advertising Injury coverage is available only for underlying litigation "arising solely out of" the Dish parties' advertising activities as the result of an enumerated Advertising Injury offense.  Commercial Umbrella Policy Form 57697 (6/93) at NU00059 and NU00061. The complaint filed in the Katz Action does not allege injury "arising solely out of" the Dish parties' advertising activities, however; rather, the injuries include all of DISH's "use" of the underlying technology (which use encompasses, for example, the transactions of  pay-per-view movies and performing customer service functions) and DISH itself concedes that the allegedly infringing telephone systems do not solely involve advertising activities by acknowledging these other activities that have nothing to do with promoting products for sale to the public. (Memorandum in Opposition to Defendants' Motions for Summary Judgment, Doc. 111 (2/01/10) at 57.)

Although DISH acknowledges National Union's sole causation requirement and concedes its Katz Action complaint alleges injuries outside of advertising, it nonetheless argues that the sole causation requirement conflicts with the requirement in the definition of Occurrence that provides

that the offense must be committed in the course of advertising the named insured's goods, products, or services.  DISH is mistaken.

As explained above, a policy is not ambiguous merely because a party develops an unreasonable or strained interpretation of the language. *Pub. Servo Co. of Colo. v. Wallis & Cos.*, 986 P.2d 924, 939 (Colo. 1999). Contrary to the Dish parties' assertion, National Union's policy provisions are in harmony with one another. The arising "solely out of advertising activities" requirement contained in the definition of Advertising Injury modifies the injury. To constitute Advertising Injury, as the National Union Umbrella Policy defines that term, the injury must arise solely out of a named insured's advertising activities. (NUSMJ, Doc. 167-3 (09/14/12) at NU00059.) In contrast, the "committed in the course of advertising" requirement in the definition of "Occurrence" modifies the offense.

To constitute an Occurrence for purposes of Advertising Injury coverage, the offense must be committed in the course of advertising the named insured's goods, products and services. (*Id.* at NU00061.) Together, the provisions complement each other and ensure that National Union's Advertising Injury coverage is not expanded to encompass exposures only tangentially related to advertising. Because the policy's terms can be harmonized, there is no ambiguity. *Wota v. Blue Cross & Blue Shield of Colo.*, 831 P.2d 1307, 1309 (Colo. 1992)("Policy provisions should be read to avoid

ambiguities if possible, and the language should not be tortured to create ambiguities.")(internal citations omitted).

Accordingly, because the complained of activity does not arise *solely* out of advertising activity and because I find the sole causation requirement does not conflict with the definition of Occurrence, National Union has no duty to defend.

<u>National Union's Satellite Exclusion Does Not Apply</u>

The National Union Umbrella Policy also contains a Satellite Exclusion endorsement, which provides as follows:

> This insurance does not apply to Bodily Injury, Property
> Damage, Personal Injury or Advertising Injury arising out
> of the ownership, operation or use of any satellite.

Commercial Umbrella Policy Form 57697 (6/93) at NU00047.)

National Union argues that as DISH owns, operates and uses satellites, it has no duty to defend the advertising injuries DISH complains of.  I disagree.  Although my disagreement does not change the outcome for National Union—the  inapplicability of this exclusion does not return coverage when I have determined that the Business Exclusion applies—I note the argument almost as a curiosity.

DISH points out that upholding the Satellite Exclusion in the manner urged by National Union would render coverage illegally illusory by way of a

hypothetical showing the absurdity of National Union's argument: "Under National Union's interpretation, the Satellite Exclusion would be applicable to a bodily injury due to a slip and fall on DISH Network's premises simply because DISH Network is in the subscription satellite television business." Doc. 173 at p.41.

I, too, can envision no scenario in which the exclusion would not apply under National Union's logic. (Perhaps neither can National Union, for its Reply did not offer a theory discarding the exception as illusory.) Colorado law will not enforce insurance policies that violate public policy by providing illusory coverage and neither will I. *See Pompa*, 520 F.3d at 1145; *O'Connor v. Proprietors Insurance Co.*, 696 P.2d 282, 283 (Colo.1985) (coverage is illusory where, insurer receives premiums "when realistically it is not incurring any risk of liability"). Fortunately for National Union, however, it has another, legally sound exclusion that removes its duty to defend, the Business Exclusion discussed herein.

<u>The XL Policy Does Not Supply Coverage</u>

The XL Policy has two distinct coverage parts. The XL Policy provides both excess (Coverage A) and umbrella (Coverage B) coverage. Coverage A provides excess coverage for injuries already covered by the underlying policies, in this case the Arrowood policy (if it were found to apply), and any other available primary insurance. Coverage A of the XL Policy follows form

to the Arrowood policy, unless the terms, conditions and exclusions of the XL Policy provide otherwise.

By way of contrast, Coverage B operates to provide "drop-down" primary coverage for injuries not covered by the underlying policy (the Arrowood policy) or any other insurance. Unlike Coverage A, Coverage B does not incorporate the exclusions contained in the underlying policies, and is excess to a self-insured retention. However, by endorsement, the XL Policy does follow form to the underlying Arrowood Policy with respect to "advertising injury".   Accordingly, if there is no "advertising injury" coverage under the Arrowood Policy, there is no coverage under XL's Coverage B.  As explained above, I hold that the Primary Insurers, Arrowood included, did not improperly withhold coverage.  Therefore, there is no coverage under XL's Coverage B.

For purposes of discussing the unique "as warranted" policy language found in Coverage A of the XL Policy, however, I assume *arguendo* that it was wrong for Defendant Arrowood to deny coverage.  The pertinent XL Policy provision reads:

> With respect to any loss covered by the terms and conditions of this policy, *but not covered as warranted by the underlying policies* listed on Schedule A, or any other underlying insurance, we will pay on your behalf for loss

caused by an "occurrence" which is in excess of the

"retained limit" for liability imposed on you by law or

assumed by you under contract for "bodily injury",

"personal injury", "property damage" or "advertising

injury."

This insurance applies only to "bodily injury", "personal

injury", "property damage" or "advertising injury" which

occurs during the policy period.

Doc. 171-1, Ex. C-1. (emphasis added).  The addition of "as warranted" as a

modifier to "not covered" obliges XL to drop down and provide coverage for

occurrences even when its underlying insurer *wrongfully* denies coverage.

*Hocker v. New Hampshire Ins. Co.*, 922 F.2d 1476, 1482 (10th Cir. 1991).

Arrowood is the listed underlying insurer to the XL Policy.

Because, however, the XL Policy has another provision that expressly

excludes coverage for "[a]ny defense, investigation, settlement or legal

expense covered by underlying insurance, " XL Policy, Ex. C-1 to Doc. p. 10,

Exclusion O. [Ex. C-1]), to the extent the claim is covered by underlying

primary insurance, the XL Policy cannot be implicated as it carves out

insuring any defense covered by underlying insurance. Thus, the XL Policy is

not required to drop down and provide primary coverage even if Arrowood's

denial of coverage was wrongful, which, of course, I have already determined

it not to have been.

<u>Insurers Did Not Act in Bad Faith</u>

As DISH's breach of contract claims against Insurers fail, so too must its "bad faith" claims.  "The issue of coverage is a central predicate to any claim of bad faith breach of the insurance contract." *Cary v. United of Omaha Life Ins. Co.,* 91 P.3d 425, 427 (Colo. App. 2003), *rev'd other grounds* 108 P.3d 288, 290 (Colo. 2005); *Jarnagin v. Banker's Life and Cas. Co.*, 824 P.2d 11, 15 (Colo. App. 1991) (judicial determination of no coverage renders attendant bad faith claim either moot or without merit as a matter of law); *Weitz Co., LLC v. Mid-Century Ins. Co.,* 181 P.3d 309, 315 (Colo. App. 2007) (finding of no duty to defend properly sustained summary judgment on bad faith claim). DISH will not be awarded any general and consequential damages.

<em>Conclusion</em>

Simply put, DISH provides television programming to a vast population and is therefore a broadcaster[15]. DISH implicitly agrees through its history of calling itself a broadcaster.  It now deems it expedient to plump up its definition by reminding the Court (and in some instances, adding altogether) that it is a "*direct satellite* broadcaster", but it is a self-proclaimed broadcaster nonetheless.  Accordingly, the Insurers' Business Exclusions negate any duty to defend DISH's advertising injuries.  Explicitly, I find that the only

---

[15] And, for that matter, a "telecaster," *see supra* at p.22-24.

reasonable interpretation of the Business Exclusion is that it applies to direct satellite broadcasters, that the allegations set forth in the underlying Katz Action complaint are "solely and entirely" within the Business Exclusion, and that therefore the Insurers have met their "heavy burden" of proving that the underlying claim cannot fall within the policy coverage. *See Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 614 (Colo.1999).  As there is no duty to defend for any insurer, there is likewise no duty to indemnify. No Insurer acted in bad faith and DISH is not entitled to any damages. The Summary Judgment motions of Arch, Arrowood, Traveler's, National Union, and XL, are GRANTED. The Partial Summary Judgment motion of DISH is DENIED.


DATED:          October 22, 2013          BY THE COURT:

                                          _**s/John L. Kane**_
                                          John L. Kane, U.S. Senior District Judge